1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6
7    JENNY BERTEL,                                    )     Case No. 2:11-cv-00537-PMP-PAL
                                    Plaintiff,    )
8                                                       )    **ORDER AND REPORT OF FINDINGS**
     vs.                                                )         **AND RECOMMENDATION**
9                                                       )
                                                        )         (Mtn for Reversal - Dkt. #19)
10   MICHAEL J. ASTRUE,                           )         (Cross Mtn for SJ - Dkt. #20)
     COMMISSIONER OF SOCIAL SECURITY,  )
11                                                       )
                                                        )
12                                    Defendant.    )
13   _____ )

14          This case involves judicial review of administrative action by the Commissioner of Social

15   Security denying Plaintiff Jenny Bertel's ("Plaintiff" or "Bertel") claim for Supplemental Security

16   Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act").

17                                    **BACKGROUND**

18   **I.    Procedural History.**

19          On April 16, 2007, Bertel filed an application for SSI benefits, alleging she became disabled on

20   April 11, 2007, based on a combination of impairments, including: bilateral degenerative joint disease of

21   the shoulders; headaches; fibromyalgia; major depressive disorder; generalized anxiety disorder;

22   borderline personality features; obstructive sleep apnea; obesity; scoliosis; and Hashimoto's thyroiditis.

23   A.R. 14, 16, 215-21, 334, 429, 478, 543, 557, 562, 564)[1].  Her claim was denied by the Social Security

24   Administration (the "SSA"), and Bertel timely requested a hearing before an Administrative Law Judge

25   ("ALJ").  The Honorable David L. Wurzel, held the hearing via video conference on June 24, 2009.

26   _____

            [1]A.R. refers to the Administrative Record in this matter.  *See* Notice of Manual Filing (Dkt. #10).

A.R. 14, 67-113.  On September 30, 2009, the ALJ issued his decision, finding Bertel was not disabled within the meaning of the Act.  A.R. 14-27.   Bertel requested review of the ALJ's decision by the Appeals Council.  A.R. 209-10.  Her request was denied on February 8, 2011, making the ALJ's decision the final decision of the Commissioner of Social Security (the "Commissioner").  A.R. 1-4.

On April 8, 2011, Plaintiff filed her Complaint (Dkt. #1) in federal court.  The Commissioner filed an Answer (Dkt. #9) July 18, 2011, along with a certified copy of the A.R.  The court entered a Scheduling Order (Dkt. #12) on August 22, 2011.  Bertel filed a Motion for Remand (Dkt. #19) on November 21, 2011, and the Commissioner responded by filing a Response and Cross-Motion for Summary Judgment (Dkt. #20) on December 26, 2011.  Bertel's filed her Reply (Dkt. #23) February 9, 2012.  The district judge referred this matter to the undersigned for findings and recommendations.

## II.   Factual Background.

Bertel was born December 23, 1976.  A.R. 25, 215.  She is married and lives with her husband, her father, and her two children, aged ten and sixteen.  A.R. 83-84.  Plaintiff's education is limited–she quit high school in the ninth grade and was in special classes because of her dyslexia.  A.R. 25.

Plaintiff's work history is sporadic at best.  At age 20, she worked as a gaming operator for the Excalibur Hotel & Casino, and she earned $461.25 in 1996 and $3,840.64 in 1997.  A.R. 242, 255.  In 2002 and 2003, Plaintiff earned less than $3,900 per year working as a pet cremator.  A.R. 242, 255.  In 2005 and 2006, Plaintiff earned less than two thousand dollars per year working as a general laborer in a pine tree nursery.  A.R. 242, 255.

### A.   Medical Records from 2006.

On April 12, 2006, Plaintiff went to Specialty Medical Clinic stating she had suffered two seizures–one at noon the previous day, and another at 6:30 a.m. that day.  A.R. 336.  The treating physician noted that Plaintiff did not appear post-ictal,[2] but advised her husband to take her to the

---

[2] The post-ictal state is the abnormal condition occurring between the end of an epileptic seizure and the return to baseline condition.  *See* R.S. Fisher & J.J. Engel, Jr., "Definition of the postictal state: when does it start and end?," *Epilepsy Behav.* (Oct. 2010) (also available in e-publication from U.S.

emergency room. *Id.* Her husband took her to Spring Valley Hospital. A.R. 308. There, she told emergency room staff that she had suffered a seizure at 4 a.m. and a second one at 6:30 a.m. *Id.* She reported that she drank alcohol socially. A.R. 308. Plaintiff underwent a CT scan,[3] which showed mild ventricular prominence but no evidence of a brain mass or abnormal calcification. A.R. 317. She was discharged the same day and prescribed Dilantin, 100mg three times daily, to control her seizures. A.R. 308.

On August 6, 2006, Plaintiff went to Specialty Medical Center to get a second opinion regarding a previous fibromyalgia diagnosis. A.R. 335. Although the medical records refer generally to Plaintiff's history of fibromyalgia, there is no record evidencing when she was first diagnosed or by whom. On August 8, 2006, Plaintiff had a normal chest x-ray. A.R. 347.

Plaintiff's medical records refer in passing to her history of scoliosis, but an August 23, 2006, radiology report by Dr. Damaj found the alignment of Plaintiff's lumbosacral and thoracic spine were within normal limits, and no abnormalities of either were noted. A.R. 346; *but see* A.R. 415 (notes history of scoliosis).

Plaintiff saw Dr. Darrin Houston at Desert View on August 28, 2006, for treatment of heart palpitations, which lasted ten or fifteen minutes, facial numbness and light-headedness. A.R. 401. The record indicates that Plaintiff was taking Lexapro and Hydrocodone. She did not report taking Dilantin to Dr. Houston or the nursing staff at Desert View although it had been prescribed to her four months earlier at Spring Valley Hospital. *Id.;* A.R. 308. Plaintiff's blood pressure was high–168/78. She was given four ounces of morphine intravenously, titrated for pain relief. A.R. 402. Dr. Houston ordered a

---

National Library of Medicine, National Institutes of Health, at www.ncbi.nlm.nih.gov/pubmed/20692877 (last visited May 15, 2012)).

[3]A CT, or computerized tomography, scan combines a series of x-ray views taken from many different angles and computer processes to create a cross-sectional image of bones and soft tissue inside the body. *See* www.mayoclinic.com/health/ct-scan/MY00309 (last visited May 15, 2012).

1  chest x-ray, and it was normal. A.R. 409. A CAT scan[4] of Plaintiff's head was normal. A.R. 410.

2  Plaintiff's Dilantin levels were not tested. A.R. 407-08.

3          Plaintiff underwent a cardiac ultrasound at Desert View on September 12, 2006, after arriving

4  with heart palpitations. A.R. 400. The results were normal. *Id.*

5          On December 3, 2006, Plaintiff went to Desert View reporting she had suffered a seizure several

6  days before, and she still felt nauseous, with vomiting and diarrhea. A.R. 388. Her Dilantin level was

7  1mcg/mL, well below the therapeutic level of 10 - 20 mcg/mL. A.R. 610.

8                          **B.      Plaintiff's 2007 Medical Records.**

9          On February 13, 2007, Plaintiff was seen by Dr. Linda Brown at the Redrock Pahrump Medical

10  Center for a consultation regarding a "new onset of seizures." A.R. 350. She told Dr. Brown her last

11  seizure occurred on January 1, 2007, in her sleep.[5] *Id.* Plaintiff told Dr. Brown that Plaintiff's husband

12  had observed the seizure, and he reported that Plaintiff's body stiffened and vibrated and that she was

13  unresponsive and made loud snoring respirations throughout. *Id.* The treating physician recommended

14  Plaintiff start Depakote, but Plaintiff was hesitant because of the potential side effects. *Id.* Plaintiff

15  reported she was not currently taking any medication. *Id.* Dr. Brown noted Plaintiff's report of a "long

16  history of fibromyalgia" and history of ADHD, for which she was prescribed "massive doses of Ritalin .

17  . . up to 125mg per day." A.R. 351.

18          Dr. Brown wrote that Plaintiff drinks one or two alcoholic drinks per month and has been a pack-

19  a-day smoker for the last thirteen years. *Id.* Plaintiff told Dr. Brown about her history of substance

20  abuse as a teenager, which included methamphetamine use. *Id.* After examination, including an

21  abnormal EEG on February 8, 2007, that was compatible with generalized seizure disorder, Dr. Brown

22  found Plaintiff "certainly needs to be on antiepileptic drugs" and recommended Lamictal. *Id.*; A.R. 355.

23  / / /

24  ─────────────────

25          [4]A CAT scan–computerized axial tomography–is the same as a CT scan. *See*
    www.medicalnewstoday.com/articles/153201.php (last visited May 15, 2012).

26          [5]There are no medical records in the A.R. related to the January 1, 2007, seizure.

She added an addendum that Topomax would also be a good choice but for Plaintiff's history of significant depression, including her suicide attempt at age seventeen.  A.R. 352.

On February 16, 2007, Plaintiff went to Desert View Regional Medical Center, complaining of abdominal pain.  A.R. 344.  She underwent an abdominal ultrasound, and it showed fatty inflitration of the liver.[6]  *Id.*

On March 13, 2007, Plaintiff went to Specialty Medical Center, complaining of a skin reaction that appeared three days prior, possibly due to medication.  A.R. 326.  The records refer to Dr. Brown's diagnosis of epilepsy three weeks prior.  A.R. 327.  Plaintiff reported that she had suffered three seizures in the preceding two weeks.  *Id.*  She underwent an MRI[7] three days later, on March 15, 2007, and her brain appeared unremarkable, with no intracranial hemorrhage, mass, or enhancing lesion.  A.R. 356, 423.

On May 8, 2007, Plaintiff was seen for back pain and strep throat at Specialty Medical Center.  A.R. 415.

Plaintiff went to Specialty Medical Center on July 17, 2007.  A.R. 414.  While at the office, she suffered a tonic-clonic (i.e., grand mal)[8] seizure lasting five minutes.  A.R. 483.  Dr. Damaj witnessed

---

[6]Fatty liver disease describes the accumulation of fat in a person's liver.  It is common, and for most people who have it, the fat that accumulates in the liver can cause inflammation and scarring in the liver.  However, it can also lead to inflammation in the liver, which impairs the liver's ability to function.  At its worst, the inflammation can lead to scarring, and over time, the scarring can become so severe that the liver fails.  *See* www.mayoclinic.com/health/nonalcoholic-fatty-liver-disease/DS00577 (last visited May 15, 2012).  Fatty liver disease can either be termed alcoholic statosis or non-alcoholic fatty liver disease.  *See* www.news-medical.net/health/Fatty-Liver-What-is-Fatty-Liver.aspx (last visited July 20, 2012).

[7] An MRI–magnetic resonance imaging–is a technique used to created detailed images of a person's organs and tissues.  It uses a magnetic field and radio waves to create the images.  When inside an MRI machine, the magnetic field temporarily aligns the water molecules in a person's body, and radio waves cause these aligned molecules to emit faint signals, which are used to create cross-sectional images.  *See* www.mayoclinc.com/health/mri/MY00227 (last visited May 15, 2012).

[8]A grand mal seizure, also known as a tonic-clonic seizure, features a loss of consciousness and violent muscle contractions.  They are caused by abnormal electrical activity in the brain, and are usually

the seizure and reported that it lasted five minutes and was a ten on the severity scale–that is, severe

enough to require hospitalization.  *Id.*  After the seizure, Plaintiff was confused and combative.  *Id.*  A

little over an hour later, at 1:35 p.m., Plaintiff arrived by ambulance at Desert View Emergency Room

and was admitted, stating she had suffered four seizures, resulting in abrasions on her face and nose.

A.R. 360.  The EMS Incident Report states that Plaintiff ripped out an IV cord that emergency medical

technicians attempted to place.  A.R. 580.  Upon arriving at the hospital, Plaintiff was agitated, moaning

and yelling on the EMS gurney.  A.R. 361.  She attempted to roll head first toward the end of the

hospital bed, away from the gurney, and crawled toward the edge of the bed, refusing to stop despite

hospital staff's commands.  *Id.*  An hour later, Plaintiff attempted to climb off the edge of the hospital

bed and was yelling and combative with staff.  A.R. 362.  Her Dilantin level was less than 3 mcg/mL.

A.R. 364.  A CAT scan of Plaintiff's head, taken the same day, was normal and showed no acute

bleeding.  A.R. 365, 378, 510.  A facial x-ray, which was "technically limited by [Plaintiff's] inability to

cooperate," noted soft tissue swelling over the right frontal bone, no acute fracture of the facial bone, and

left maxillary sinusitus.  A.R. 366, 511.  During her stay overnight, she was "totally asymptomatic, was

doing well, ambulatory, with no complications."  A.R. 368.  She was discharged the following day, on

July 18, 2007.  A.R. 615.  The Observation Discharge Report prepared by Dr. Damaj indicates that a

repeat test of her Dilantin level was 9 mcg/mL upon discharge.  *Id.*  Two days later, on July 20, 2007,

Plaintiff's Dilantin level had fallen to 5mcg/mL.  A.R. 516.

On July 23, 2007, Plaintiff went to Specialty Medical Center for a follow-up appointment.  A.R.

413.  She was referred to a neurologist.  *Id.*  On July 30, 2007, her Dilantin level was 5.1 mcg/mL.  On

August 8, 2007, Plaintiff returned to Specialty Medical.  A.R. 446.  Her Dilantin level was 5 mcg/mL.

On August 22, 2007, Plaintiff's Dilantin level was 6.8 mcg/mL.  A.R. 513.  On August 29, 2007,

Plaintiff was seen at Specialty Medical, reporting she had suffered a seizure.  A.R. 445.

/ / /

caused by epilepsy, though they can also occur from extremely low blood sugar or stroke.  *See*
www.mayoclinic.com/health/grand-mal-seizure/DS00222 (last visited May 15, 2012).

Dr. Stephen Gerson conducted an independent internal medicine evaluation of Plaintiff for the Bureau of Disability Adjudication on October 24, 2007, after reviewing some of Plaintiff's medical records.  A.R. 425.  He reported that Plaintiff had a history of fibromyalgia, lasting the previous twelve years.  Plaintiff reported seeing a rheumatologist, who confirmed the diagnosis and prescribed medication.  A.R. 425.  She had constant pain in her joints and muscles and felt tired every day.  *Id.*  She saw an orthopedic surgeon, who recommended conservative care.  *Id.*  Plaintiff reported that she took Lortab, which gave mild relief for her symptoms.  *Id.*  She had muscle spasms and low back pain, which sometimes radiated into her legs, causing intermittent numbness.  A.R. 426.  She had difficulty bending, sitting, standing, and walking due to her back pain.  *Id.*  She told Dr. Gerson she took Gabapentin and Dilantin for seizures and related that "the medications are helping a lot.  Her last seizure was over two months ago."  A.R. 426.  She reported that she had smoked 3/4 pack of cigarettes for eleven years and that she was a non-drinker.  *Id.*  She told Dr. Gerson her last job was working in a plant nursery in 1997. *Id.*

On examination, she had tenderness in her neck without spasm and a full range of motion.  A.R. 427.  Dr. Gerson found mild scoliosis, with mild convexity to the right.  *Id.*  Her gait had a mild limp, and he found tenderness at the following bilateral joints: shoulders, wrists, elbows, dorsal hands, hips, knees, and ankles.  A.R. 427-28.  He also found bilateral anterior and posterior leg muscle tenderness. A.R. 428.

Dr. Gerson found that Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently; could sit or walk six hours of an eight-hour work day; that alternating sitting and standing, coupled with standard breaks and lunch period would provide sufficient relief; she could never climb ladders or scaffolds; she could occasionally use ramps or stairs, stoop/bend, kneel, crouch/squat, and crawl.  A.R. 429-30.  He found she was limited to reaching above the shoulders and should not move machinery or work at heights.  A.R.430-31.  He observed that she moved and rotated both hands and arms in many directions during the examination without any obvious pain or distress.  A.R. 431.  He reported that Plaintiff did not appear acutely toxic or clinically fatigued during the exam.  *Id.*

1    On October 29, 2007, Debbie Klingelhoets completed a Physical Residual Functional Capacity

2    Assesment of Plaintiff.  A.R. 433- 40.  Her findings were based upon Dr. Gerson's October 24, 2007,

3    examination of Plaintiff and are the same as his.  She stated her objective findings did not support the

4    severity of Plaintiff's subjective complaints.  A.R. 438.

5    On October 29, 2007, Plaintiff went to Specialty Medical because of swelling in her legs and

6    heart palpitations.  A.R. 444.  On November 8, 2007, Plaintiff returned to Specialty Medical to receive

7    the results from her Holter monitor study.  Plaintiff said she had no palpitations while on the monitor but

8    still had daily episodes that were longer lasting and accompanied by lip tingling and lightheadedness.

9    A.R. 443.  The doctor noted that Plaintiff had still not completed lab testing regarding her low Dilantin

10   levels from August 2007.  *Id.*  She told the doctor she was seeing a chiropractor for her fibromyalgia

11   pain.  *Id.*  She was referred to a cardiologist and a neurologist.  *Id.*

12   Plaintiff saw a chiropractor for her fibromyalgia pain on October 31, 2007.  A.R. 535.  On

13   November 1, 2007, Plaintiff had an x-ray taken of her pelvis, and it showed no abnormality.  A.R. 537.

14   On November 8, 2007, Plaintiff's Dilantin level was 4.1 mcg/mL.  A.R. 512.  As a result, on

15   November 23, 2007, Plaintiff's doctor increased her dosage from 500 mg to 600 mg daily.  A.R. 522.

16   On November 10, 2007, Plaintiff went to Specialty Medical.  The records refer to Plaintiff

17   starting Lamictal, but because it caused a rash, Dr. Damaj switched Plaintiff to Dilantin.  A.R. 524.

18   Plaintiff reported she still suffered multiple petit mal seizures.  *Id.*

19   On November 27, 2007, Plaintiff had a CT scan of her abdomen, which showed significant

20   artifact[9] due to the high density oral contrast used, but otherwise identified no acute abnormality.  A.R.

21   492.

22   On December 7, 2007, Plaintiff had an abdominal and pelvic ultrasound, both of which showed

23   no abnormality.  A.R. 490, 491, 519.  The next day, on December 8, 2007, Plaintiff had an MRI that

24

25   [9]An artifact is a mark on an MRI image.  There are numerous kinds of artifacts that can occur.
     Some affect the diagnostic quality of the MRI examination, while others, which do not affect the quality,

26   can be confused with pathology.  *See* www.mritutor.org/mritutor/artifact.htm (last visited May 17, 2012)
     (describing, with pictures of MRI images, some of the different kinds of artifacts that can occur).

1   showed no acute abnormality.  A.R. 489, 519.   Plaintiff told the physician her pelvic pain was resolved,

2   and the doctor referred Plaintiff for a sleep study.  *Id.*

3                   **C.     Plaintiff's 2008 Medical Records.**

4           On January 10, 2008, Plaintiff went to Specialty Medical to get pain medication for headaches

5   and spine pain.  A.R. 641.  Plaintiff told the doctor that Plaintiff's sister "takes Lortab 10. [Lortab] 2 is

6   an insult."  *Id.*  The doctor referred Plaintiff for a psychiatric exam for a second time.  *Id.*

7           On January 12, 2008, Dr. Damaj completed a Residual Functional Capacity Questionnaire.  A.R.

8   478-81.  He diagnosed her with seizures and chronic fatigue.  A.R. 478.  He reported Plaintiff suffered

9   four or five seizures per month, though Plaintiff's previous three occurred over a five-week period on

10  December 2 and 20, 2007, and January 9, 2008.  *Id.*  He reported Plaintiff's seizures usually lasted five

11  minutes.  *Id.*  Her post-ictal manifestations include confusion, exhaustion, irritability, severe headaches.

12  muscle strain, and paranoia, and these symptoms usually lasted between thirty minutes and two or three

13  hours.  A.R. 479.  Plaintiff would be non-functional for the work day after a seizure, and her seizures

14  would disrupt the work of her co-workers.  *Id.*; A.R. 480.  Plaintiff's medical history includes injury

15  during seizures and fecal or urinary incontinence.  A.R. 479.  Dr. Damaj found Plaintiff was compliant

16  with taking medication.  *Id.*  He opined that Plaintiff was unable to work and was incapable of even low

17  stress jobs.  A.R. 480.  She would need very frequent breaks of fifteen to thirty minutes, and she would

18  likely miss more than four days of work per month.  A.R. 481.

19          The record also includes a Seizure Witness Description Form completed by Plaintiff's husband,

20  John Bertel, on January 17, 2008.  A.R. 484.  He reported that in 2007, Plaintiff suffered two seizures in

21  January, five seizures in October, three seizures in November, and three seizures in December.  *Id.*  He

22  reported that Plaintiff was injured during some of her seizures by falling, and the seizures usually lasted

23  fifteen or twenty minutes.  *Id.*  He rated Plaintiff's seizures as a nine or ten on the severity scale.  *Id.*

24  After her seizures, Plaintiff acted confused and lethargic; she often vomited, was dizzy, and then slept

25  for hours.  *Id.*  She was weak or unable to function for a day or two after they occurred.  *Id.*

26  / / /

Plaintiff completed two Seizure Witness Description Forms on January 7, 2008, for seizures that occurred on January 4 and 6, 2008.  A.R. 485-86.  Her seizure on January 4, 2008, lasted more than two minutes and was a six on the severity scale.  A.R. 486.  Afterward, she was unable to immediately resume activity, was confused and sleepy and vomited.  After sleeping, she had a lingering headache.  *Id.*  The seizure on January 6, 2008, lasted five or six minutes, and was a four on the severity scale.  A.R. 485.  Afterward, she felt sick to her stomach, had a dull ache behind her eyes, and her balance was altered.  *Id.*

On January 8, 2008, Plaintiff went to Specialty Medical concerning an abnormal EKG.  A.R. 518.  On January 21, 2008, Plaintiff returned to Specialty Medical for a follow-up visit.  A.R. 517.  She mentioned again that her sister gets ten Lortab10 per day.  *Id.*  Plaintiff was referred to a rheumatologist.  *Id.*

On March 4, 2008, Plaintiff underwent an x-ray of her cervical spine,[10] which revealed a normal limited cervical spine.  A.R. 536.

On March 27, 2008, Dr. Beckie Grgich, Psy.D., of Advanced Insight Behavioral Health, completed a Nevada Disability Evaluation without having reviewed Plaintiff's medical records from the State of Nevada Bureau of Disability.  A.R. 539-544, 540.  Plaintiff reported to Dr. Grgich she could care for her personal hygiene mostly independently, but her husband helped shave her legs due to pain when bending.  He also helped her wash and braid her hair due to Plaintiff's shoulder pain.  A.R. 540.  She could cook simple meals, but was unable to maintain her home or shop without help.  *Id.*  Dr. Grgich found that "[t]he activities described by the claimant are consistent with the observations of the examiner."  *Id.*  Plaintiff reported she was unable to maintain social relationships, other than with one female friend, with whom she spoke on the phone.  *Id.*  She said her pain had increased, and she was

---

[10]The cervical spine is also known as the neck.  It begins at the base of the skull and includes seven vertebrae with eight pairs of cervical nerves.  The purpose of the cervical spine is to contain and protect the spinal cord, support the skill, and enable diverse head movement (e.g., rotate side to side and bend forward and back).  *See* www.spineuniverse.com/anatomy/cervical-spine-anatomy-neck (last visited May 15, 2012).

1   sometimes so exhausted that she "just want[ed] to lie down on the floor and go to sleep no matter what's

2   going on." *Id.* Plaintiff denied the use of drugs or alcohol but admitted to smoking a pack of cigarettes a

3   day. A.R. 541. She told Grgich her epilepsy caused her to see colors or patterns and "spiders" out of the

4   corner of her eye when angry. *Id.*

5        Plaintiff told Dr. Grgich she was admitted to the hospital for psychiatric care at age seventeen

6   after an attempted suicide, but she had not seen a mental health care professional in quite a few years.

7   *Id.* Dr. Grgich stated "[t]here are substantial indicators of somatic preoccupations and concerns with

8   bodily ailments. However, statements related to illness or injury appear to be reality-based as long as her

9   medical conditions can be verified." A.R. 542. Dr. Grgich also found that Plaintiff's "mood may

10   exacerbate her symptoms." *Id.*

11        Dr. Grgich diagnosed Plaintiff with moderate, recurrent major depressive disorder, generalized

12   anxiety disorder, and borderline personality features. A.R. 543. She observed Plaintiff had a limited

13   ability to interact appropriately with supervisors, co-workers, and the public because of her depression,

14   anxiety, mood swings, and loss of motivation. *Id.* Dr. Grgich's prognosis of Plaintiff's ability to return

15   to an active job market was "very guarded" and "totally dependent" upon reports from Plaintiff's treating

16   physician. *Id.* Dr. Grgich opined that Plaintiff's mental health deficits would likely prevent her from

17   maintaining gainful  employment for at least one year. *Id.*

18        On March 28, 2008, Matenne Karelitz, M.D. completed a Physical Residual Functional Capacity

19   Assessment of Plaintiff. A.R. 545-552. Dr. Karelitz found no evidence of scoliosis, stating Plaintiff had

20   a "normal spine." A.R. 550. She also reported that at one point during the assessment, Plaintiff said her

21   seizure medications have no side effects, but later, Plaintiff reported they did. *Id.* Dr. Karelitz found

22   there was "no evidence to support any shoulder impairment that would restrict activity." A.R. 551. She

23   opined that the severity and duration of Plaintiff's symptoms were disproportionate to the expected

24   severity or duration given Plaintiff's seizure disorder. A.R. 550. The RFC indicated Plaintiff could

25   occassionally lift and/or carry twenty pounds, frequently lift and carry ten pounds, stand or walk with

26   normal breaks for six hours of an eight-hour work day, and could push and pull without restriction. A.R.

546. Plaintiff could occasionally climb ramps and stairs, frequently balance, and occasionally stoop, kneel, crouch, or crawal. *Id.*

On March 31, 2008, Dr. Pastora Roldan, Ph.D., completed a Psychiatric Review Technique of Plaintiff, considering Plaintiff from April 11, 2007, to March 31, 2008. A.R. 557-70. In a check-the-box form, and relying upon Dr. Karelitz's RFC Assessment (A.R. 545-52), Dr. Roldan found Plaintiff had moderate, recurrent major depressive disorder, generalized anxiety disorder, and borderline personality features but that Plaintiff's impairments were not severe. A.R. 557, 560, 562, 564.

On April 3, 2008, Plaintiff went to Specialty Medical to review lab results. A.R. 638. The doctor found Plaintiff was depressed and needed to see a psychiatrist. *Id.* Plaintiff again mentioned her sister got ten Lortab10 per day because her sister's doctor took her sister seriously. *Id.*

On April 25, 2008, Plaintiff went to Specialty Medical for a consultation and further testing concerning swelling and fatigue. A.R. 637. The doctor reported that Plaintiff "still refused to see rheumatology/cardiology/psychiatry as prev[iously] advised." *Id.*

On May 2, 2008, Plaintiff had an ultrasound of her thyroid to test for thyromegaly,[11] which was unremarkable. A.R. 663. On May 8, 2008, Plaintiff went to Desert View after injuring her neck during a seizure. A.R. 585. On May 12, 2008, Plaintiff went to Specialty Medical because she had a rash lasting three days. A.R. 636. The doctor's notes indicate Plaintiff had started a new medication for her thyroid. *Id.*

Also on May 12, 2008, Sandra Smith, M.D., found that Plaintiff presented with hypothyroidism, and the following week, on May 19, 2008, she diagnosed Plaintiff with Hashimoto's disease.[12] A.R.

---

[11]Thyromegaly is an abnormally enlarged thyroid gland, which can result from under- or overproduction of hormone or from a deficiency of iodine in the diet. *See* www.thefreedictionary.com/thyromegaly (last visited May 15, 2012).

[12]In Hashimoto's disease, also known as chronic lymphocytic thyroditis, a person's immune system attacks his or her thyroid gland, and the resulting inflammation often leads to an underactive thyroid, also known as hypothyroidism. Treatment of Hashimoto's disease with thyroid hormone replacement is usually "simple and effective." *See* www.mayoclinic.com/health/hashimotos-

-12-

635-36.  Dr. Smith prescribed Synthroid, a thyroid hormone used to treat hypothyroidism.  *Id.*  On June 3, 2008, Plaintiff returned to Specialty Medical, where she reported that she had suffered no grand mal seizures and that her fatigue was improved with thyroid medication.  A.R. 634.

On June 30, 2008, Plaintiff was seen at Advanced Insight Behavioral Health.  A.R. 621-25.  The Intake Assessment reported that Plaintiff did not use alcohol, but occasionally used marijuana.  A.R. 622.  Plaintiff reported that she was previously diagnosed with bipolar disorder and multiple personality disorder.  A.R. 623.  She told doctors that she had a history of cutting, and she had stabbed herself with scissors a week and a half before the appointment.  A.R. 624.

On July 17, 2008, Plaintiff was wheezing, and the doctor ordered a chest x-ray.  It showed mildly increased interstitial markings scattered throughout both lungs, which could represent inhalational exposure, including tobacco.  A.R. 658.  On the same day, Plaintiff's Dilantin level was 11.4 mcg/mL.  A.R. 644.  On August 13, 2008, Plaintiff went to Specialty Medical for a follow-up appointment, where she requested a refill of Lortab.  A.R. 630.  Plaintiff told the doctor she took Lortab three to four times per day because it helped with the pain in her bones and muscles.  *Id.*

### D.   Plaintiff's 2009 Medical Records.

On April 18, 2009, Plaintiff saw Dr. Simmon Wilcox at Desert View Hospital Emergency Room for back pain, uncontrolled head and neck movement, visual disturbances, feelings of shakiness and dizziness, and fever and sweats.  A.R. 668.  Her Dilantin level was 4 mcg/mL.  A.R. 672.

On September 4, 2009, Plaintiff's representative at the administrative hearing, Mr. Noel S. Anschutz, sent the ALJ a facsimile reporting that Plaintiff sent an email that she was in a "deep depression" and has started "self mutilating/cutting."  A.R. 206.  Mr. Anschutz advised seeking mental health care in Las Vegas, as it was not available locally to Plaintiff in Pahrump.  *Id.*

Plaintiff was admitted on a phyciatric hold to Desert View Medical Center on September 13, 2009.  A.R. 38- 60.  She reported feeling frustrated because she did not know what was wrong with her,

disease/DS00567 (last visited May 15, 2012).

1  and she had low energy and chronic joint pain. A.R. 41. She reported feeling suicidal and wanting to

2  hang herself. A.R. 41. A nurse reports that Plaintiff had scratches on her arms and legs that were self-

3  inflicted. A.R. 59. Plaintiff demonstrated signs and symptoms of major depression. A.R. 60. Her

4  Dilantin level at the time of admission was 4.7 mcg/mL. A.R. 57. Plaintiff also tested positive for THC.

5  A.R. 55. Two days later, on September 15, 2009, Plaintiff's Dilantin level on was 2.4 mcg/mL. A.R.

6  52.

7      On September 19, 2009, Plaintiff went to the emergency room at Desert View Hospital, reporting

8  a grand mal seizure lasting the entire day. A.R. 33. She told the emergency room nurse that she "loses

9  her medication." A.R. 34. Plaintiff's Dilantin level was 9.2 mcg/mL A.R. 36.

10     **III.    Testimony at the Administrative Hearing.**

11     **A.    Vocational Expert Testimony**

12     Plaintiff's administrative hearing was held on June 24, 2009 via video conference in Las Vegas,

13  Nevada. Plaintiff was late for the administrative hearing due to traffic, and the ALJ first heard testimony

14  from the Vocational Expert ("VE"), Katie Macy-Powers. The VE had been a certified rehabilitation

15  counselor for twenty years and had testified as a vocational expert in Social Security disability hearings

16  regularly for three years. A.R. 72-73. The ALJ asked the VE to consider a hypothetical individual who

17  was thirty-two years old, had a limited eighth grade education, and a very poor work history. The ALJ

18  also added that the hypothetical individual could lift and carry up to ten pounds, sit for six hours per

19  eight-hour workday, and stand and walk for two hours per eight-hour workday.  Finally, the ALJ's

20  hypothetical individual had following non-exertional limitations: no reaching or working above shoulder

21  level with either upper extremity; never climbing ladders, ropes, or scaffolds; occasionally climbing

22  ramps and stairs; occasionally stooping and crouching; never balancing, kneeling, or crawling; avoiding

23  all exposure to dangerous moving machinery, electric shock, radiation, unprotected heights, and open

24  water; avoiding even moderate exposure to extremes of heat, cold, and humidity; and mentally limited to

25  unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the

26  public. A.R. 74-76. The ALJ asked the VE to opine whether this hypothetical person, given these

-14-

1    limitations, could return to his or her past work as a pet creamtor.  A.R. 76.  The VE testified that this

2    hypothetical individual could not return to her past work, but could perform and sustain a forty-hour

3    work week of sedentary, unskilled work–such as a stuffer, sorter, sealer, or polisher.  A.R. 76-77.

4         If, however, the hypothetical claimant had an additional limitation of taking unscheduled breaks

5    very frequently during an eight-hour workday lasting fifteen to thirty minutes each and would miss more

6    than four days of work per month, he or she would not be able to perform other work existing in

7    significant numbers in the national economy.  A.R. 78.  At the conclusion of the VE's testimony, the

8    ALJ swore her in, and the VE affirmed her previous testimony.

9         **B.    Plaintiff's Testimony.**

10        Plaintiff arrived at the hearing thirty-five minutes after it started.  A.R. 79.  The ALJ

11   acknowledged receiving Plaintiff's request to subpoena Dr. Damaj but denied that request because it

12   "did not meet the regulatory requirements for issuance of a subpoena."  *Id.*  Plaintiff testified she was

13   born in Las Vegas, Nevada, and finished the eighth grade.  *Id.*  She quit school during ninth grade

14   because she became pregnant.  *Id.*  She spent two months in an adult education course to obtain her

15   GED, took the test twice, but her math skills were too low to earn the degree.  A.R. 80-81.

16        Plaintiff testified she worked as a pet cremator from 2002 to 2003, and although it was full time

17   work, she left because she could not keep up.  A.R. 82.  Plaintiff did not have gainful employment after

18   that job.  A.R. 83.

19        Plaintiff lived with her husband and two children, aged ten and sixteen, and her father, who takes

20   care of himself.  A.R. 83-84.  Her husband was unemployed and received unemployment benefits, which

21   are the family's sole source of income.  A.R. 84.  Plaintiff testified she was in special education classes

22   between fifth and seventh grade because "emotionally [she] was having problems with the other

23   children.  It was easier for [her] to be in smaller classes."  A.R. 85.  She was unable to work because her

24   seizure condition has interrupted her life and "all the little symptoms I have are extremely interrupted

25   [sic] and destructive to functioning normally."  *Id.*  She got dizzy and was often sick, with no energy,

26   and she suffered from visual anomalies because of her neurological disorder.  *Id.*  She described these

1   anomolies as "flashing lights, strange aura" with dizziness and confusion and lasting from a few minutes

2   to twenty minutes at a time.  A.R. 86.  These symptoms occurred nearly every day for the four years

3   preceding the hearing.  *Id.*   She testified that she had minor seizure activity in the morning and often

4   had stomach cramps and diarrhea for hours after awakening.  A.R. 87.  Additionally, she suffered from

5   migraine headaches and dizziness.  *Id.*

6   She testified that she weighed approximately 230 pounds and used a CPAP machine for the past

7   two years.  *Id.*  She was diagnosed with sleep apnea after participating in sleep studies.  A.R. 86-87.  She

8   stated she smoked around a half pack of cigarettes per day.  A.R. 88.

9   Plaintiff testified that Dr. Sandra Smith at Specialty Medical Center in Pahrump, Nevada,

10  diagnosed Plaintiff with Hashimoto thyroid disease at the beginning of 2008.  A.R. 89.  She took

11  medication to regulate her thyroid for the past year.  *Id.*  She was referred to a rheumatologist in the

12  beginning of 2008, but she did not keep her appointment because she had no health insurance.  A.R. 90.

13  The last time she saw a doctor was seven months before the administrative hearing, and Medicaid paid

14  for that visit.  *Id.*  She was ineligible for Medicaid at the time of the hearing because her husband was

15  receiving unemployment benefits.  *Id.*  She had a seven month prescription of her seizure medicine,

16  Dilantin, and she took 600 mg per day for the last two years.  A.R. 90-91.  She testified that she took her

17  seizure medication every day as prescribed and had done so since she began taking it in 2006.  A.R. 91.

18  She never tried a different seizure medicine than the Dilantin or Lamictal because she could not afford to

19  see a neurologist.  A.R. 94.  Her sister received Dilantin from Pfizer's free prescription program, but

20  when she no longer needed Dilantin, she gave the leftover pills to Plaintiff.  A.R. 109-110.  Plaintiff

21  does not know why her Dilantin levels are continuously low.  *Id.*

22  She had adverse reactions to Dilantin, including swollen lymph nodes, rash, and fever.  A.R. 95.

23  She told Dr. Smith she was unhappy with Dilantin, but Dr. Smith was not comfortable changing

24  Plaintiff's medication because Dr. Smith was not a neurologist.  *Id.*  Plaintiff last saw Dr. Smith seven

25  months prior to the administrative hearing.  A.R. 96.  At that time, Plaintiff did not have a rash, but "was

26  just feeling funky" from the Dilantin.

-16-

1    The most she used to drink was three beers a day two to three times per month, but she has not

2    consumed alcohol since 2005.  A.R. 96.  She stated she has never used methamphetamine.  *Id.*  She used

3    marijuana a few times when she was seventeen, but she has not used it in the last ten years.  A.R. 97.

4    She has never used any illegal drug other than marijuana.  *Id.*

5    She last went to the grocery store two weeks before the hearing, and she only went rarely,

6    "maybe once or twice a month."  *Id.*  She prepared simple meals–such as putting a pizza in the

7    oven–twice a week, at most.  A.R. 97-98.  She did not do the dishes but she did laundry two to three

8    times per month.  A.R. 98.  The last time she cleaned her home was approximately a year and a half or

9    two years before the administrative hearing.  A.R. 98.  She had not used a vaccuum in three years.  *Id.*

10   However, she partially wiped down the counters and helped her husband make the bed within a week of

11   the administrative hearing.  A.R. 99.  She spent her days talking and playing games with her children and

12   "kind of supervis[ing] everything and giving everyone lots of love."  A.R. 100.  She had four dogs.  *Id.*

13   Her children fed and walked the dogs, although she filled the dogs' indoor water bowl in the house.

14   A.R. 101.

15   Plaintiff testified that she has grand mal, partial, and absence seizures.  A.R. 102.  She suffered

16   between ninety and 120 seizures.  A.R. 103.  She had a seizure several days before the administrative

17   hearing but did not go to the hospital.  *Id.*  She went to the hospital after a grand mal seizure three times.

18   *Id.*  She had injured herself during seizures by falling, including from an exam table at Dr. Damaj's

19   office.  A.R. 104.  She also had small seizures three to five times per week, and she was mostly aware of

20   them while she is having them.  A.R. 104-05.  The frequency of her grand mal seizures fluctuated a lot.

21   A.R. 106.  She also suffered from absence seizures.  A.R. 107.  She was not aware of these when they

22   occured.  *Id.*  A.R. 106.  People around her say that she looks like she is daydreaming.  *Id.*  Her family

23   did not tell her about about all of them because they did not want to worry her.  A.R. 106-7.  Plaintiff's

24   doctors taught Plaintiff's husband how to handle her seizures, and therefore, she does not always go to

25   the hospital after one.  A.R. 112.

26   / / /

-17-

Plaintiff testified that she did not believe she suffered from fibromyalgia.  A.R. 107.  She believed she had a genetic autoimmune disease.  *Id.*  She could not remember the names of the doctors who diagnosed her with fibromyalgia.  *Id.*  She went to Desert View in April 2009 because she had an unusal amount of neurological activity, felt strange, and thought that her Dilantin level should be checked.  A.R. 110.  She testified that she believed many of her non-seizure symptoms are caused by Hashimoto's disease.  A.R. 111.

**IV.    The ALJ's September 30, 2009, Decision (A.R. 14-27).**

At step one, the ALJ found Bertel had not engaged in substantial gainful employment since April 16, 2007, the application date.  A.R. 16.  At step two, he found Bertel suffered from the following severe impairments: epileptic seizure disorder; degenerative joint disease, both shoulders; obstructive sleep apnea, on CPAP; mild scoliosis; hypertension; fatty liver; headaches; obesity (65 inches tall, 210-to-230 pounds, BMI 35-38); major depressive disorder; and generalized anxiety disorder.  Although Plaintiff also alleges disability based upon fibromyalgia, the ALJ found the record did not support a finding that fibromyalgia was a medically-determinable impairment.  *Id.*  The ALJ found that although Dr. Gerson, who examined Plaintiff on a consultative basis, diagnosed fibromyalgia, Dr. Gerson's opinion did not meet the diagnostic criteria for fibromyalgia[13] for three reasons.  *Id.*  First, Dr. Gerson diagnosed a "tender" response to digital palpation rather than a "painful" one.  *Id.*  Second, the ALJ found Dr. Gerson's findings "far too vague" to meet the diagnostic criteria for fibromyalgia.  *Id.*  Third, Dr. Gerson made irrelevant findings to a fibromyalgia diagnosis, including tender points at the ankles, hands, and fingers.  A.R. 17.  Additionally, when Plaintiff sought a second opinion concerning Dr. Gerson's diagnosis, no tender points at all were noted on physical examination, and no diagnosis of fibromyalgia was made.  *Id.*  Finally, on April 3, 2008, Bertel's treating physician told her that she "does not have fibromyalgia."  A.R. 17.

_____

[13]*See generally* T.K. Van Sistine, M.D., *Fibromyalgia: Specific Diagnosis of Fibromyalgia* (Jan. 20, 2000) (available at www.spine-health.com/conditions/fibromyalgia/fibromyalgia-specific-diagnosis-fibromyalgia) (summarizing the American College of Rheumatology's 1990 published criteria for classification of fibromyalgia).

1    At step three, the ALJ found Plaintiff does not have an impairment or combination of

2    impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart

3    P, Appendix 1.  The ALJ considered Plaintiff's mental impairments, individually and in combination,

4    and found they did not meet or equal the criteria of listings 12.04 and 12.06, including whether

5    Paragraph B criteria were satisfied–that is, whether the mental impairments resulted in at least one

6    "extreme" limitation or two marked limitations.

7    At step four, the ALJ found, based on his independent review of the record as a whole, that

8    Plaintiff retained the RFC to perform work at the sedentary exertional level, lifting and carrying up to ten

9    pounds, sitting for six hours per eight-hour workday, and standing and walking for two hours per eight-

10   hour workday, with myriad non-exertional limitations, including: no reaching or working above shoulder

11   level with either upper extremity; never climbing ladders, ropes, or scaffolds; occasionally climbing

12   ramps and stairs; occasionally stooping and crouching; never balancing, kneeling, or crawling; avoiding

13   all exposure to dangerous moving machinery, electric shock, radiation, unprotected heights, and open

14   water; avoiding even moderate exposure to extremes of heat, cold, and humidity; and mentally limited to

15   unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the

16   public.  A.R. 20-21.  Based upon his RFC finding and the Vocational Expert's testimony, the ALJ

17   determined Plaintiff was unable to perform her past relevant work as a cremator.  A.R. 25.  Finally, at

18   step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined there

19   are jobs that exist in significant numbers in the national economy–including the representative

20   occupations of polisher, sorter, sealer, and stuffer–that Plaintiff can perform and sustain on a regular and

21   continuing basis.  *Id.*   Thus, Plaintiff was not disabled as of the application date.  A.R. 26-27.

22                                              **DISCUSSION**

23   **I.    Judicial Review of Disability Determination**

24   District courts review administrative decisions in social security benefits cases under 42  U.S.C.

25   § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides, "[a]ny

26   individual, after any final decision of the Commissioner of Social Security made after a hearing to which

1  he was a party, irrespective of the amount in controversy, may obtain a review of such

2  decision by a civil action . . . brought in the district court of the United States for the judicial district in

3  which the plaintiff resides."  42  U.S.C. § 405(g).  That statute also provides that the District Court may

4  enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing

5  the decision of the Commissioner of Social Security, with or without remanding the cause for a

6  rehearing."  The Ninth Circuit reviews a decision of a District Court affirming, modifying, or reversing a

7  decision of the Commissioner *de novo*.  *Batson v. Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

8         The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42

9  U.S.C. § 405(g).  The Commissioner's findings may be set aside if they are based on legal error or are

10  not supported by substantial evidence.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  The

11  Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance;

12  it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

13  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir.

14  2001).  In determining whether the Commissioner's findings are supported by substantial evidence, the

15  court "must review the administrative record as a whole, weighing both the evidence that supports and

16  the evidence that detracts from the Commissioner's conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720

17  (9th Cir. 1998); *see also Smolen*, 80 F.3d at 1279 (holding that courts must weigh both the evidence that

18  supports and the evidence that detracts from the Commissioner's conclusion).  Under the substantial

19  evidence test, the Commissioner's findings must be upheld if supported by inferences reasonably drawn

20  from the record.  *Batson,* 359 F.3d at 1193.  When the evidence will support more than one rational

21  interpretation, the court must defer to the Commissioner's interpretation.  *Id.*  If the evidence can

22  reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its

23  judgment for the ALJ's judgment.  *Flaten v. Sec'y of Health and Human Serv.,* 44 F.3d 1453, 1457 (9th

24  Cir. 1995).

25         It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the

26  findings.  *Lewin*, 654 F.2d at 635 (citing *Baerga v. Richardson*, 500 F.2d 309 (3d Cir. 1974)).  In order

-20-

1   to enable the court to properly determine whether the Commissioner's decision is supported by

2   substantial evidence under 42 U.S.C. § 405(g), the ALJ's findings "should be as comprehensive and

3   analytical as feasible and, where appropriate, should include a statement of subordinate factual

4   foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

5   **II.     Disability Evaluation Process**

6           To qualify for disability benefits under the Social Security Act, a claimant must show that:

7           (a)      he or she suffers from a medically determinable physical or mental impairment that can

8                    be expected to result in death or that has lasted or can be expected to last for a continuous

9                    period of not less that twelve months; and

10          (b)      the impairment renders the claimant incapable of performing the work that the

11                   claimant previously performed and incapable of performing any other substantial

12                   gainful employment that exists in the national economy.

13  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

14          The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182

15  (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate

16  an "inability to engage in any substantial gainful activity by reason of any medically determinable

17  physical or mental impairment which can be expected . . . to last for a continuous period of not less than

18  12 months." 42 U.S.C. § 423(d)(1)(A).  If a claimant establishes an inability to perform his or her prior

19  work, the burden shifts to the Commissioner to show that the claimant can perform other substantial

20  gainful work that exists in the national economy.  *Batson*, 157 F.3d at 721.

21          **A.     Five-Step Sequential Evaluation Process**

22          20 C.F.R. § 416.920 establishes a five-step sequential evaluation process to be followed by the

23  ALJ in a disability case.  *Mendoza v. Apfel*, 88 F. Supp. 2d 1108, 1111 (C.D. Cal. 2000).  The first step

24  requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.

25  20 C.F.R. 416.920(b).  If the claimant is currently engaged in substantial gainful activity, a finding of

26  non-disabled is made, and the claim is denied.  The second step requires the ALJ to determine whether

the claimant has a severe impairment or combination of impairments that significantly limit him or her from performing basic work activities.  20 C.F.R. § 416.920(c)).  If the ALJ determines that the claimant has no such impairment, a finding of non-disabled is made, and the claim is denied.  The third step requires the ALJ to compare the claimant's impairment(s) with those impairments in the Listing of Impairments ("Listing") located at 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. § 416.920(d).  If the impairment(s) meets or equals an impairment in the Listing, disability is conclusively presumed, and benefits are awarded.

If the impairment(s) does not meet or equal an impairment in the Listing, step four requires the ALJ to determine whether the claimant has sufficient RFC despite his or her impairment(s), to perform past work.  *See* 20 C.F.R. § 416.920(e).  RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.  Social Security Administration, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 SSR LEXIS 5, *8.  If the claimant is still capable of performing past work, a finding of non-disabled is made, and the claim is denied.  The claimant has the burden of proving that he or she cannot perform past work.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).  If the claimant cannot perform past work, a prima facie case of disability is established, and step five shifts the burden to the Commissioner to prove that the claimant, based on his or her age, education, work experience, and RFC, can perform other substantial gainful work that exists in significant numbers in the national economy.  20 C.F.R. § 416.920(f).  If the ALJ finds that any one of the five steps establishes that the claimant is not disabled, no further evaluation is required.  *See* 20 C.F.R. § 404.1520(a).

### B.    Standard of Review

When deciding a Social Security appeal, the decision of the Commissioner must be affirmed if it is supported by substantial evidence, and the Commissioner applied the correct legal standards. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) (citation omitted).  Substantial evidence is relevant evidence which a reasonable person might accept as adequate to support a conclusion when the entire record is considered.  *Id.* (citation omitted).  It "is more than a mere scintilla,

1    but less than a preponderance." *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003)

2    (citation omitted).  The Commissioner's "resolution of any conflicts in the evidence, if reasonable, must

3    be affirmed.  *See Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) ("[W]e must uphold the

4    [Commissioner's] decision where the evidence is susceptible to more than one rational interpretation");

5    *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) ("We must uphold the ALJ's decision where the

6    evidence is susceptible to more than one rational interpretation").   Where the evidence can reasonably

7    support either affirming or reversing the Commissioner's conclusion, the court may not substitute its

8    own judgment for that of the Commissioner. *Batson*, 359 F.3d at 1196 (citation omitted).  Thus, the

9    question before the court is not whether the Commissioner reasonably could have reached a different

10   outcome, but whether the Commissioner's final decision is supported by substantial evidence.  *See*

11   *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).    It is unequivocally the claimant's burden to

12   demonstrate that he or she has a disabling mental or physical condition by providing "specific medical

13   evidence" in support of the claim. 20 C.F.R. § 404.1514; *see Bayliss v. Barnhart*, 427 F.3d 1211, 1217

14   (9th Cir. 2005) (citing *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) ("The claimant bears the

15   burden of proving she is disabled.")).

16       C.    **The Parties' Positions**

17           1.    **Plaintiff's Motion for Remand (Dkt. #19).**

18           Plaintiff contends the ALJ failed to fully develop the record and violated Plaintiff's due process

19   right to a fair hearing.  Specifically, Plaintiff asserts the ALJ erred in denying Plaintiff's request to

20   subpoena Dr. Damaj for the administrative hearing because Plaintiff "did not follow some unidentified

21   regulation."  Motion at 11:24-25.

22           Plaintiff asserts the ALJ made incomplete findings at step two of the evaluation process because

23   he failed to make findings regarding Plaintiff's Hashimoto's disease, and the symptoms of this

24   impairment track closely with her claims of fatigue, loss of concentration, and "other symptoms."  *Id.* at

25   13:1. Plaintiff fails to describe these other symptoms in any detail, noting only that explanatory materials

26   are available in the record, and a "transcript page is unavailable."  *Id.* at n.6.

-23-

1    Plaintiff asserts the ALJ erred at step three of the evaluation process by failing to comply with

2    *Marcia v. Sullivan,* 900 F.2d 172 (9th Cir. 1990).  She contends the ALJ did not discuss whether any of

3    Plaintiff's physical impairments equaled one of the listed impairments–in particular, listings 11.02 or

4    11.03, for epilepsy.  The ALJ's erroneous findings regarding Drs. Damaj's and Grgich's credibility

5    caused him to make an erroneous finding at step three of the analysis.  In *Marcia*, Plaintiff argues, the

6    Ninth Circuit held an ALJ must "explain adequately his evaluation of alternative tests and the combined

7    effects of the impairments."  900 F.2d at 176.  Because the ALJ failed to properly consider Plaintiff's

8    combined impairments, this matter should be remanded for a proper step three determination.

9    Additionally, the ALJ improperly rejected the opinions of treating doctors, and as a result,

10   assessed an incomplete RFC/vocational hypothetical.  He improperly rejected the opinions of Dr. Damaj

11   and Dr. Grgich.  The ALJ's vocational hypothetical failed to include limitations established by Dr.

12   Grgich, and when presented with limitations assed by Dr. Damaj, the VE testified that no job in the

13   national economy would be available to Plaintiff.

14   Finally, Plaintiff asserts the ALJ improperly considered the issue of compliance with medication

15   and erroneously found Plaintiff's statements about her symptoms and their functional effect not credible.

16   The ALJ made no finding that Plaintiff was malingering, and therefore, he was obligated to state clear

17   and convincing reasons for discrediting Plaintiff's testimony.  The ALJ's basis for discrediting Plaintiff

18   was that she was non-compliant in taking her anti-seizure medication.  No doctor opined she was non-

19   compliant, and Dr. Damaj found Plaintiff *was* compliant.  Plaintiff asserts her low Dilantin level was due

20   to malabsorption issues, coupled with her loss of insurance coverage, and her testimony should not be

21   discredited due to "her difficulty with the medication."  Motion at 16:15-16.

22        **2.       Commissioner's Cross-Motion for Summary Judgment and Opposition (Dkt.**

23             **#20).**

24             **a.       Rejection of Dr. Damaj's Opinion.**

25   The Commissioner asserts that the ALJ was not required to give Dr. Damaj's opinion controlling

26   weight, despite the fact that he was one of Plaintiff's treating physicians, because it was not well-

-24-

supported by, but rather inconsistent with, other substantial evidence in the record.  Although the ALJ rejected Dr. Damaj's opinion, the rejection was supported by substantial evidence in the record.  First. the ALJ found Dr. Damaj's opinion was internally inconsistent and not supported by the record as a whole.  For example, Dr. Damaj stated he had treated Plaintiff for two years, and Plaintiff suffered four to five seizures per month, but on the form he completed in January 2008, he wrote that Plaintiff's prior three seizures spanned a period greater than one month.  In December 2006, Plaintiff reported that she had a history of only four seizures, and in October 2007, she told Dr. Gerson the anti-seizure medication was "helping a lot," and her last seizure was more than two months before.  This conflicting evidence justified the ALJ's conclusion that Dr. Damaj's opinion was unreliable.

Second, Dr. Damaj's opinion was conclusory and unsupported by objective findings.  Dr. Damaj submitted no treating records and cited no clinical findings to support his opinion.  Instead, his opinion relied upon Plaintiff's subjective complaints, which were properly discredited by the ALJ.

Additionally, Dr. Damaj's opinion that Plaintiff is disabled is contradicted by the opinions of Drs. Gerson and Karelitz.  Dr. Gerson opined that Plaintiff could perform light exertion, frequently reach, frequently balance, and occasionally perform other postural activities, with limits on heights and around machinery.  He found Plaintiff was not acutely toxic or clinically fatigued when he examined her, and she could move and rotate both hands in many directions without obvious pain or distress.  Dr. Karelitz also found Plaintiff could perform light exertion with postural limitations, if Plaintiff avoided heights and machinery.  Because of these conflicting opinions, and because the determination of disability is reserved to the Commissioner, the ALJ permissibly rejected Dr. Damaj's opinion.

The Commissioner asserts that the ALJ was not required to develop the record.  The duty to develop the record is only triggered where the record is ambiguous or inadequate to allow proper evaluation of the evidence.  Neither of these situations exist in this case, and the ALJ was not required to hear testimony from Dr. Damaj because Damaj's testimony was not relevant to the full presentation of the case.

/ / /

### b.   ALJ's Findings at Step Two and RFC Finding.

The ALJ did not err at step two of the analysis because no physician assessed any functional limitations regarding Plaintiff's ability to perform basic work functions as a result of her Hashimoto's disease or thyroiditis, and Dr. Smith, the doctor who diagnosed Plaintiff with Hashimoto's disease, found Plaintiff's condition immediately responded to medication.  Moreover, because the ALJ found Plaintiff had other severe impairments, he was required to consider the functional effect of *all* Plaintiff's impairments–severe and non-severe alike.  Thus, whether he classified her Hashimoto's disease as severe was irrelevant.  Even if the court finds the ALJ should have made explicit findings about Plaintiff's Hashimoto's disease in connection with his RFC finding, any failure to do so is harmless because Plaintiff has not identified any additional limitations the ALJ should have assessed.

### c.   ALJ's Findings at Step Three–Listed Impaiments.

Relying on *Lewis v. Apfel,* 236 F.3d 503, 513 (9th Cir. 2001), the Commissioner asserts that although the ALJ did not extensively discuss Plaintiff's physical impairments in his findings at step three, he thoroughly discussed the evidence supporting his finding elsewhere in his opinion.  To meet or exceed an impairment under § 11.02 requires convulsive seizures occurring more than once per month.  Listing 11.03 requires a finding of non-convulsive seizures occurring more than once per week.  Plaintiff told Dr. Gerson in October 2007 that her last seizure was two months prior, and her anti-seizure medicine was helping a lot.  A.R. 426.  Because the ALJ rejected Dr. Damaj's opinion as unsupported by the record, his finding that no physician credibly opined that Plaintiff's condition met or equaled a listing was proper.  Additionally, Drs. Karelitz and Roldan found that Plaintiff's condition did not meet or equal a listing.  A.R. 19, 545-56, 557-70.  Therefore, substantial evidence supports the ALJ's findings at step three.

### d.   ALJ's Credibility Determination.

The Commissioner contends that the ALJ did not arbitrarily discredit Plaintiff's subjective testimony and that the ALJ's credibility findings are sufficiently specific and properly supported by the record.  First, the ALJ found Plaintiff had a poor work history before the onset of her disability, never

earning more than $4,000 per year in any of her three jobs.  The ALJ found this reflected poorly on her motivation to work.  Second, the ALJ found Plaintiff and her examining physician described daily activities that were inconsistent with Plaintiff's disabling symptoms and limitations, including Plaintiff's ability to do light cooking, care for her personal hygiene, attend to her children, go to the grocery store, do laundry, and help clean the kitchen.  Third, the ALJ relied upon his observation that Plaintiff's demeanor at the hearing was poor.

Fourth, the ALJ relied on inconsistencies concerning Plaintiff's failure to take her anti-seizure medication.  Plaintiff testified at the hearing that she had taken her Dilantin every day in the prescribed amount since 2006.  However, the record suggests otherwise.  For example, in February 2007, she told Dr. Brown that she had adverse effects from Dilantin and "currently is not on any medication at all." Additionally, her Dilantin levels were subtheraputic on many occasions.  Even accepting Plaintiff's contention that malabsorption problems caused this, the ALJ was entitled to rely on Plaintiff's inconsistency to conclude her claim of taking Dilantin as prescribed was not credible.  Additionally, an October 2007 progress notes states that Plaintiff's Dilantin level was low in August 2007, but she did not suffer seizures during that time.  The Commissioner asserts this suggests Plaintiff did not take her Dilantin because her seizure disorder is not as severe as she alleged.

Finally, the ALJ found Plaintiff's allegations of disability were unsupported by objective clinical findings.  Although the government acknowledges this may not be the sole basis for discounting symptom testimony, it is one factor an ALJ may consider in the credibility analysis.  Here, the objective medical evidence does not support Plaintiff's testimony about her symptoms.  For example, Dr. Brown found that Plaintiff's gait was normal, her muscle tone, mass, and strength were intact, and her sensory examination was grossly intact.  Dr. Gerson found Plaintiff walked with a mild limp, had some joint tenderness, but noted she gesticulated with her hands without pain and did not appear clinically fatigued. He also found Plaintiff's concentration was intact, her short and long term memory were grossly intact, her behavior was appropriate, she followed instructions without difficulty, and she was oriented. Similarly, Dr. Grgich found Plaintiff was mentally oriented, with unimpaired clarity of consciousness,

intact judgment, average intellectual functioning, and good memory.  Given the lack of corroborating evidence in the record, the ALJ properly found Plaintiff's allegations were not credible.

The ALJ, therefore, gave Plaintiff's subjective complaints the maximum reasonable benefit of the doubt in concluding she could only perform a limited range of sedentary work.  To the extent Plaintiff alleged limitations beyond that, the ALJ provided valid reasons for discrediting her, and his credibility findings were sufficiently specific.

### e.       The ALJ's Rejection of Dr. Grgich's Assessment.

The Commissioner asserts the ALJ's RFC finding was consistent with the functional limitations Dr. Grgich assessed.  The ALJ considered and adopted Dr. Grgich's opinion that Plaintiff was limited in her ability to interact appropriately with supervisors and co-workers.  Dr. Grgich's opinion that Plaintiff could not maintain employment for at least a year, however, is an opinion reserved to the Commissioner.  The ALJ also rejected this prognosis because it was: (a) unsupported by Grgich's examination of Plaintiff; and (b) grounded in Plaintiff's subjective complaints, which the ALJ properly discredited.

### f.       The ALJ's Reliance on the VE's Testimony.

The Commissioner maintains the ALJ was not required to consider the limitations assessed by Drs. Damaj and Grgich in forming his hypothetical to the VE because he was entitled to reject these doctors' opinions and Plaintiff's own alleged limitations, as discussed above.  An ALJ may limit a hypothetical question to a VE to restrictions supported by substantial evidence in the record.

### 3.       Plaintiff's Reply.

Plaintiff contends that her due process rights were abridged because she was not permitted to call her treating physician, Dr. Damaj.  Plaintiff requested a subpoena for Dr. Damaj prior to the hearing, and although her request failed to comply with 20 C.F.R. § 405.332, her representative offered to cure "whatever the unnamed deficiency was, but she was not allowed to do so."  Motion at 3:4-5.  The ALJ's failure to hear testimony from Bertel's treating physician contravened his duty to develop the record and Social Security Ruling 85-16, which requires that an ALJ "shall make every reasonable effort to obtain from the individual's treating physician . . .  all medical evidence."  *Id.*

-28-

Plaintiff asserts the Commissioner's Response attempts to clarify and justify the ALJ's findings and ascribes rationales to findings that the ALJ did not express.  For example, the ALJ never found Dr. Damaj's opinion was "internally inconsistent," and the Commissioner cites to the A.R. rather than the ALJ's decision in making its arguments.  The ALJ should have set forth clear and convincing reasons for rejecting Dr. Damaj's opinions.  The ALJ's rationale that Dr. Damaj used a form to opine as to Plaintiff's disability and had relocated from Las Vegas are insufficient to reject his opinion.

## V.   Analysis and Findings

Reviewing the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit legal error.

### A.   The ALJ Satisfied His Duty to Develop the Record.

It is well-established an ALJ has "a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered."  *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)).  Because a claimant bears the burden of proving disability, the ALJ's duty to further develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Tonapetyan*, 242 F.3d at 1150.  Plaintiff asserts the ALJ should have heard testimony from Dr. Damaj because he was Plaintiff's treating physician and the only doctor to witness Plaintiff's seizures.  Although Plaintiff's representative obtained a seizure questionnaire from Dr. Damaj, Plaintiff wanted the doctor present to answer questions and explain Plaintiff's impairments.

Plaintiff does not assert that there is ambiguous evidence in the record or that the record is inadequate to allow for proper evaluation of the evidence.  She does not claim that any her records from Dr. Damaj are missing from the A.R. such that the ALJ's duty to develop the record was triggered.  Plaintiff does not contend the ALJ could not properly evaluate this matter without hearing testimony from Dr. Damaj.  She merely concludes, without any articulated reasoning, that Dr. Damaj's opinion "is critical to the case."  This conclusory statement is insufficient to establish that the ALJ failed to develop

-29-

the record.  Plaintiff has not made an offer of proof or provided any information about Dr. Damaj's anticipated testimony.

**B.    The ALJ's Rejection of Dr. Damaj's Controverted Opinion Was Not Error.**

Bertel argues that the ALJ erred in rejecting the opinion of Dr. Damaj, her treating physician. The implementing regulations for Title II of the Social Security Act distinguish among the opinions of three types of physicians: first, treating physicians; second, examining physicians (*i.e.,* physicians who examine but do not treat a claimant); and third, non-examining or reviewing physicians (*i.e.,* physicians who neither examine nor treat the claimant, but review the claimant's file).  *Lester v. Chater*, 81 F.3d, 821, 830 (9th Circuit 1995); 20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than an examining physician's, and an examining physician's opinion is entitled to more weight than a reviewing physician's.  *Lester*, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).  The social security regulations give more weight to opinions that are explained than those that are not.  20 C.F.R. § 404.1527(d)(3).  The Social Security Regulations also give more weight to opinions of specialists concerning matters relating to their specialty over that of non-specialists.  20 C.F.R. § 404.1527(d)(5).

When an ALJ rejects a treating physician's opinion that is contradicted by another doctor, the ALJ must provide specific, legitimate reasons based on substantial evidence in the record.  *See Valentine v. Comm'r of Soc. Sec. Admin.,* 574 F.3d 685, 692 (9th Cir. 2009); *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F.3d 1194, 1198 (9th Cir. 2008); *see also Magallanes v. Bowen*, 881 F.2d 747, 757 (9th Cir. 1989) (noting that an ALJ satisfies the burden of providing specific, legitimate reasons to reject a controverted treating physician opinion where he or she sets out a "detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings").  An ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.  *See Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1228 (9th Cir. 2009).

/ / /

-30-

Here, the ALJ clearly considered Dr. Damaj's opinion. He found that although Dr. Damaj claimed to have seen the claimant at least once per month for two years, the doctor failed to submit any treating records, laboratory, or test results as requested by the Seizure RFC Questionnaire he completed on January 8, 2008. A.R. 478-81. The ALJ found that although Dr. Damaj reported that Plaintiff suffered four or five seizures per month, on the same form, the doctor reported that in the preceding five weeks, Plaintiff had only three seizures. The ALJ found Dr. Damaj's claim of multiple seizures was flatly contradicted by the medical record, which establishes Plaintiff will go for months without a seizure. He observed that in December 2006 and July 2007, Plaintiff reported that she had a history of only four seizures, and in October 2007, she reported it was two months since her last seizure. The ALJ also noted that Dr. Damaj's report was a fill-in-the-blank form with only minimal marginal notes. Dr. Damaj did not cite any laboratory testing or other objective evidence to support of his opinions regarding Plaintiff's RFC, instead relying only on Plaintiff's subjective complaints, which the ALJ found were not credible.

Additionally, Dr. Damaj found Plaintiff was compliant with taking her anti-seizure medication. The ALJ found this "incredible" and unsupported by Plaintiff's medical records, which show Plaintiff's Dilantin levels were sub-theraputic nearly every time they were checked. After the hearing, Plaintiff's husband submitted a statement dated July 6, 2009, claiming that due to his unemployment, he could no longer afford Plaintiff's medication. A.R. 291-92. In an email to her representative dated September 3, 2009, Plaintiff relayed the same problem, stating her husband's friend offered to give her Dilantin. A.R. 203. However, Plaintiff's mother wrote a letter stating that in early 2009, she personally observed her daughter Michelle give Plaintiff "a year's worth of Dilantin" that Michelle no longer needed. A.R. 296. Although Plaintiff claims to have an absorption issue, there is only one sentence in the entire record to support this. On September 15, 2009, Dr. Michael Jackson wrote "Despite adequate dosing of [D]ilantin in Desert View Hospital[, Plaintiff's] levels continue to be low." A.R. 29; *compare* A.R. 36 (Plaintiff's Dilantin level was 9.2 mcg/mL when discharged on September 19, 2012) *with* A.R. 57 (Plaintiff's

/ / /

-31-

Dilantin level was 4.7 mcg/mL when admitted on September 13, 2012).  There is nothing else in the record to support Plaintiff's claims of malabsorption.

Finally, the ALJ found Dr. Damaj's opinions were inconsistent with state agency medical consultants Drs. Gerson and Karelitz, who both reviewed Plaintiff's entire medical history, while Dr. Damaj had not.  Dr. Gerson reported that Plaintiff told him her last seizure was two months prior to that appointment, and the anti-seizure medications "are helping a lot."  He found she could perform light limited exertion and did not appear acutely toxic or clinically fatigued on the date of the exam.  A.R. 439-41.  Likewise, Dr. Karelitz found Plaintiff could perform limited light exertion.  A.R. 546-49.

**C.     The ALJ Did Not Make Incomplete Findings at Step Two.**

Plaintiff contends the ALJ's findings at step two are incomplete because he failed to consider Plaintiff's Hashimoto's disease.  The ALJ determined that Plaintiff had the following severe impairments: epileptic seizure disorder; degenerative joint disease, both shoulders; obstructive sleep apnea, on CPAP; mild scoliosis; hypertension; fatty liver; headaches; obesity (65 inches tall, 210-to-230 pounds, BMI 35-38); major depressive disorder; and generalized anxiety disorder.  He made no findings with regard to Plaintiff's Hashimoto's disease.

The court finds there is no evidence in the record to show Plaintiff has any functional limitation based on her Hashimoto's disease.  An impairment (or combination of impairments) is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 416.921(a).  No physician, including Dr. Sandra Smith–the doctor who diagnosed Plaintiff with the thyroid condition–assessed any limitations as a result of thyroiditis or Hashimoto's disease.  In fact, Dr. Smith's progress notes show Plaintiff's fatigue responded to synthetic thyroid hormone medication.  A.R. 634.  Additionally, at the hearing, Plaintiff testified that although she believed many of her non-seizure symptoms were related to Hashimoto's disease, Dr. Smith had not made that determination.  Plaintiff has not cited any medical records, nor has the court found any in the administrative record, to support her contention that the impairments related to her Hashimoto's disease, alone or in combination

/ / /

-32-

with other impairments, are severe within the meaning of the Social Security regulations.  Thus, the ALJ did not err in finding Plaintiff was not currently severely impaired by Hashimoto's disease.

### D.    The ALJ Did Not Err at Step Three.

Plaintiff asserts the ALJ did not comply with the Ninth Circuit's directive in *Marcia* for an adequate explanation of an ALJ's evaluation of alternative tests and combined impairments in determining whether a claimant equals a listed impairment in 20 C.F.R. § 404, Subpart P, App. 1.  *See* 900 F.2d at 176.  However, the Ninth Circuit has also held that "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (citing *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001)). In *Lewis,* the court distinguished *Marcia,* determining that the ALJ's failure to consider equivalence was not reversible error because the claimant did not offer any theory, plausible or otherwise, as to how his impairments combined to equal a listing impairment.  236 F.3d at 514.

The ALJ considered listings 12.04 (affective disorders characterized by disturbance of mood) and 12.06 (anxiety-related disorders) and found Plaintiff's impairments did not equal a listing.  Plaintiff does not assert which listing the ALJ should have considered, pointing only to listings 11.02 (convulsive epilepsy, with seizures occurring more than once per month) and 11.03 (non-convulsive epilepsy, with non-convulsive seizures occurring more than once per week) as examples.  Plaintiff does not point out any evidence in the record to support the diagnosis and findings of a listed impairment.  20 C.F.R. § 404.1525.  Plaintiff bears the burden of proving a disability.  *See Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989).

Furthermore, although the the ALJ did not made specific findings regarding listings 11.02 and 11.03 under the step three heading, he did so elsewhere in the opinion.  In *Lewis,* the Ninth Circuit clarified that where an ALJ discusses and evaluates evidence supporting his conclusion that a claimant's symptoms do not meet or equal a listed impairment, that is sufficient.  236 F.3d at 513.  There is no requirement that an ALJ do so under any particular heading.  *Id.*  Here, the ALJ found that Plaintiff

-33-

reported to Dr. Gerson that she had not had a seizure in two months and the medication was "helping a lot." A.R. 23. The ALJ properly rejected Dr. Damaj's opinion and found that no physician has credibly opined that Plaintiff's condition meets or equals any listing. A.R. 19. Additionally, Drs. Roldan and Karelitz opined that it does not. A.R. 19, 545-56, 557-70. Thus, the record supports the ALJ's findings at step three.

**E.      The ALJ Did Not Err in Making a Credibility Determination.**

The Ninth Circuit has consistently held that "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982); *see also Allen v. Heckler*, 749 F.2d 577, 580 n.1 (9th Cir. 1985). "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallenes*, 881 F.2d at 750. However, the ALJ's credibility findings must be supported by specific, cogent reasons. *See Rahad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990); *see also Yuckert v. Bowen*, 841 F.2d 303, 307 (9th Cir. 1988). General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *see also Dodrill v. Shalala*, 12 F.2d 915, 918 (9th Cir. 1993). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing. *See Lester,* 81 F.3d at 834. In weighing a claimant's credibility, an ALJ may consider: the claimant's reputation for truthfulness; inconsistencies between his or her testimony and conduct; the claimant's daily activities and work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *See Smolen*, 80 F.3d at 1284 (citations omitted). An ALJ's personal observation of a claimant at a hearing may also be considered in the overall evaluation of credibility. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); SSR 96-7p.

The court finds the ALJ gave specific legitimate reasons for discrediting Plaintiff's statements concerning the degree of her impairments and limitations. The ALJ specifically identified which testimony he discredited and stated the evidence he relied upon in making that determination. Where

-34-

evidence supports either confirming or reversing the ALJ's decision, the court may not substitute its judgment for that of the ALJ's. *See Batson*, 359 F.2d at 1196.  The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause only some of the alleged symptoms, and that statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment." A.R. 22.  The ALJ noted Drs. Brown and Gerson both evaluated Plaintiff's mental and physical health, finding both were grossly intact.  The ALJ found there was no significant record of hospitalization and that the record contradicts the frequency of seizures Plaintiff alleges.  Although she suffers from depression and anxiety, the ALJ stated that Plaintiff had never been under the regular and continuing care of a mental health professional.  He found Plaintiff and her husband were untruthful in their claims that Plaintiff's Dilantin levels are low due to an inability to afford medication.  A.R. 25.  He found Plaintiff's poor work history reflects poorly on her motivation for gainful employment and that her demeanor as a witness at the administrative hearing was poor.

The court's review of the record also supports the ALJ's credibility findings.  For example, Plaintiff testified at the administrative hearing that she had not consumed alcohol since 2005.  A.R. 96.  However, on at least two occasions between 2006 and 2008, she reported to doctors that she drank socially.  A.R. 308, 541.  Plaintiff denied using marijuana for ten years at the administrative hearing.  A.R. 97.  However, she admitted to occasional marijuana use in an interview with a psychologist on June 30, 2008.  A.R. 622.  She tested positive for marijuana use on September 19, 2009.  A.R. 55.  She denied ever having used methamphetamine at the administrative hearing.  A.R. 96.  However, she admitted having used methamphetamine on February 13, 2007.  A.R. 351.  Plaintiff testified at the hearing that she had not missed a dose of her anti-seizure medication since it was prescribed to her in 2006.  A.R. 96-97.  However, she did not report taking Dilantin in August 2006, and she told Dr. Brown in February 2007 that she "currently is not on any medication at all." A.R. 350.  In a June 6, 2009, post-hearing statement, Plaintiff's husband claimed Plaintiff could not afford "proper medication."  A.R. 291-92.  However, Plaintiff's mother represented she had personally witnessed Plaintiff's sister give Plaintiff

"almost a year's worth" of Dilantin at the beginning of 2009.  A.R. 296.  Additionally, Plaintiff emailed her representative on September 3, 2009, that a friend of her husband's wife offered to give Plaintiff her Dilantin.  A.R. 203.  In short, the record as a whole supports the ALJ's credibility determination that Plaintiff is not as limited as she claims.

## V.   **Conclusion**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  If the record will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's.  *Flaten*, 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole and to resolve conflicts in the evidence and differences of opinion.

There are some conflicts in the evidence and some differences in the medical opinions expressed by Plaintiff's treating, examining, consulting, and evaluating physicians.  Plaintiff argues she suffers from multiple severe physical and emotional impairments which prevent her from engaging in any employment.  However, having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g) and that the ALJ applied the correct legal standard in reaching his decision.

For all of the foregoing reasons,

**IT IS RECOMMENDED**:

1.    Plaintiff's Motion to Remand (Dkt. #19) be DENIED.

2.    The Commissioner's Cross-Motion to Affirm (Dkt. #20) be GRANTED.

Dated this 20th day of July, 2012.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE